Good morning. Good morning, Your Honor. We are here for the case of Andrew Pauwels v. Deloitte LLP, Deloitte Tax LLP, and the Bank of New York Mellon et al. Docket number 2221-CV. I think we start with Mr. Pauwels, and it looks like we have Joshua Shildon. Thank you, Your Honor. You're tall, and the mics may not be tall enough. You can raise the... I find the only people who really know how to work that are usually high school students. Believe it or not, we have one of these in our office now. Okay, good. Thank you. It's a relief. Good morning, Your Honors. You know, I'm talking more than the lawyers, and I know that's not right, but just speaking for myself, we don't talk about the cases as a general rule beforehand, so I'm speaking only for myself. I am, myself, most interested, because there's a lot of issues here and not all that much time. I, myself, am most interested in the unjust enrichment and the fraud claims, and I thought it might be helpful for those of you who are interested in one book, since you know what I'm interested in. Thank you, Your Honor. I'd like to address that as an initial matter. There were several errors made by the court in determining that our second amended complaint did not plausibly plead allegations for various types of appropriation, including a claim for unjust enrichment. Under New York law to state a claim for unjust enrichment, you must allege that the defendant was enriched at the plaintiff's expense and equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover. In this instance, the court applied what the court considered to be a rule, barring any unsuccessful plaintiff from pleading an alternative claim for unjust enrichment, where they also plead a claim for a misappropriation of a trade secret. That is not the law in New York, and that is not a fair application of the law in New York. Is there a slightly softer way of understanding that, which is that if the claim fails, not on the whether it's a trade secret, but on whether what happened constitutes misappropriation of a trade secret, if it fails on that argument, those are essentially the same considerations that would come into play in determining whether the enrichment here was unjust. I don't agree, Your Honor, and I think that this case is a very helpful example. A trade secret, as we all know, is subject to a seven-part factor test, and an analysis can move the bar on any one of those factors, as it did here for the court. The only factor that was essentially challenged was the secrecy of the trade secret. Now, I would argue that you can also misappropriate something that's not necessarily secret because it is valuable and proprietary. And if the court was to determine that steps were not taken sufficiently to protect and limit the access to the secrecy of this model, you can still argue that they didn't pay for the proprietary work that they were getting. And we've pled that adequately and quite plainly because what he did as a consultant was protect his work. And when they asked him to share examples of it, he took extra steps to protect it. But ultimately, in order to have that relationship in the way that they wanted to use the benefit of his work, they wanted to be able to check the sheet, to check his analysis. And he did that based on his understanding. But taking that analysis, which they weren't paying for, and we've alleged that they only paid for him to work as a consultant, not for the underlying intellectual property, the analytical tool that he created, that was clearly giving him a competitive advantage until they were able to and we don't know exactly what they did, but until they were able to replace him with Deloitte and use the model that he created. That is unjust. They were clearly enriched. They clearly failed to pay him for that model as opposed to for his time. That's a factual issue that we are entitled to litigate. And when you say they, because we have two defendants, is it unjust enrichment for the bank, which was the customer to whom he willingly provided the spreadsheets instantiating the model, for them to continue to use the spreadsheets that he provided them for their ongoing purposes? Yes, Your Honor. It was improper because if they had paid for that analytical tool, that would have been a different negotiation, a different process, and likely a different price. If he sells that tool that he's created, the value of his intellectual property is then gone and they have it. Now he could create a different tool and sell it to a different company, which he may do regardless of whether he's working as a consultant for them. But the value in what he created clearly had value and they clearly wanted it and they obtained it in a way that was dishonest, and that's why the third prong is triggered, that equity and good conscience can't allow them to manipulate this individual and steal what he's created without getting them the benefit of the bargain. So where was the dishonesty in their obtaining the tool? Well, Your Honor, we argue specifically in the fraud claim that he was induced to provide them with this to help them obtain third party and other investors who would help these projects be achieved. Even from the get-go? So from day one they were hiring him in the hopes that he would cough up a model which they could then use for other people? We'll determine that when we get access to emails and take depositions. It can still be unjust enrichment if that wasn't their original intent and they decided to do that at some point without negotiating a fair and proper exchange for the value of that. I have a question about appellate jurisdiction. You've taken an appeal from a final judgment, but my understanding is that the district court granted the motions to dismiss as to all but an unjust enrichment claim about $47,000. That's right, Your Honor. So is this a final judgment? And if it's not, do we have appellate jurisdiction? And if we don't, can you fix it? It is a final judgment. We reached settlement on the outstanding amount of the money that was left. So that's been taken care of? That has been taken care of and the case is closed. Thank you. I think we have something. It was easy to deduce that it was settled, but I think we have some papers in there somewhere. I think it's in the record, Your Honor, but we can double-check. If there's no more questions, I will reserve the rest for rebuttal. Thank you, Mr. Sheldon. We'll start with Mr. Banks from the Bank of New York. Thank you, Your Honor. Good morning, Your Honors. Michael Banks for BNY Mellon. I had planned to begin with a trade secret claim unless the court would prefer that I proceed differently. I'd actually, we were a little bit on the roll on the unjust enrichment. And I would be interested to make sure that we cover that in our discussion. Of course. And I will cover it because we submit that it is duplicative to a large extent, as Judge Abrams found of the trade secret claim. I am inclined to start with that and then move to the unjust enrichment. Sure, Your Honor. If that is satisfactory. The spreadsheets that Mr. Pauls was paid to create for the bank were not trade secrets, in large part because he failed to take any of the necessary steps that would be. They could be trade secrets if he took the steps that were necessary. Well, there would be a factual question about that. What steps would, what would he have done? What should he have done beyond what he did in order to preserve his right to claim their trade secrets? There are many steps, Your Honor, that he could have taken at the outset. One, and most customarily, we see confidentiality agreements, written confidentiality agreements from the outset of the project when he began to do the work in 2019 that would have delineated who owns the spreadsheets, what could be done with them, and who has access to them. Does it make a difference whether it's written or oral? I'm sorry, Your Honor? Does it make a difference whether it's written or oral? Yeah, it perhaps could have been oral, but he does not contend that he reached an explicit oral agreement when he began to do the work either. He could have password protected them or encrypted them. He could have limited e-mail distribution, or he could have put something on the spreadsheets themselves, even labeled them confidential. I have not seen any case where such a paucity of effort resulted in a finding from a court. But surely everything that's confidential is not a trade secret. No. Actually, trade secret protection is much more robust. There are many pieces of confidential business information that do not rise to the level of a trade secret. So how do you take something that could be a trade secret, such as these spreadsheets, and protect them as trade secrets? What should he have done? What he should have done is enter into an explicit agreement with the bank, in writing, that delineated what the trade secret status was, if he believed they were trade secrets, of these spreadsheets. Usually that will also entail labeling as confidential or trade secret after the agreement is reached. He did none of that. What he contended in his amended complaint, his second amended complaint, was that in 2014, five years after he began to provide the Paul's model to the bank, what he calls the Paul's model, that he had a discussion with two people at the bank about the use of the spreadsheets. How senior were they? I'm sorry? How senior were they? Fairly senior people at the bank. What he contends occurred is there was a question of whether it would be appropriate to share the spreadsheets that he had already delivered to the bank with a third party, an investment sponsor. So not being used for the benefit of the bank's analysis, but a true third party. He says he told the bank, no, he did not think it would be appropriate to share those with this third party, and the bank agreed. But by then, as Judge Abrams noted, he had already delivered the spreadsheets to the bank. He had been working on this particular project for eight months. He had been delivering his spreadsheets and model for five years. And as Judge Abrams held correctly, the horse had left the barn by then. If you don't get protections in place at the commencement of the work before you deliver it, as Judge Abrams said, you have effectively conceded that these are not trade secrets and that you do not have the same proprietary ownership of them. Does that affect value? Does that affect the worth of the spreadsheets in the hands of the bank? More valuable or less valuable? I'm not sure I understand the question, Your Honor. I apologize. Would the bank pay the same amount of money for access to this if it was a trade secret? We can only speculate as to that as to whether had he asked at the beginning in 2009 or even in March of 2014 when he embarked on the wind energy project, whether that would have affected the pricing of it. The fact is, though, that the bank purchased the spreadsheets, had no contractual restrictions on its use of the spreadsheets, and then used them for its own investment analysis purposes only and for no other purpose. It never commercialized them or sold them for any other purpose. That use for its own purposes was consistent with what was contemplated at the outset. I mean, that's a certain we're reading the allegations here, and aren't we obligated to read them in a light most favorable to the plaintiff? His allegation is not that, as you represented when you started your argument, he was hired to prepare spreadsheets for the bank. His argument is he was hired to provide advice, and to the extent that he developed a tool that informed the advice that he gave the bank and to the extent that he shared that with the bank to support his reasoning and provide the bank, that doesn't mean the bank hired him to give them the tool. Well, even if, as you note, Your Honor, he was hired to give advice, he delivered the spreadsheets without any contractual restriction on the bank's ability to use them. The obligation to guard or protect trade secret status means that if you put those trade secrets in the hands of another party, the opposite side of a business transaction, you must ensure that you take steps that that other party is restricted or limited in its ability to use them. So I'm trying to focus back on this unjust enrichment claim. Let's assume for a second that we understand your argument vis-à-vis the trade secrets. I thought that you said that trade secrets are a more robust protection and that there are things that are confidential that aren't trade secrets. And the things that are confidential but may not be trade secrets might have value. And I guess the question is, just because it's not a trade secret, why does that decide the question of whether it would be unjust enrichment for the bank to continue to use the tool? If we recognize, as Judge Abrams did, that these spreadsheets and the advice and any analysis provided by Mr. Pauls did not rise to the level of a trade secret, then let's think about what he did for a moment. He said, I'm going to provide you some advice and I will back it up with spreadsheets. I will put those in your hands and for that I will charge a fee. He charged a rather healthy fee, as he noted, and he was paid the fee in its entirety. He was paid for the work that he delivered. He never said to the bank, I am going to charge extra to deliver the spreadsheets or that the spreadsheets themselves have independent value. The bank was not enriched. The bank paid him for what he delivered, and there is no allegation to the contrary, that he did work that the bank somehow misappropriated unjustly for its own benefit beyond what he agreed to provide for a fee. But you would agree that the unjust enrichment claim does not depend on the spreadsheets being a trade secret. Well, in this case, in this particular circumstance, Your Honor, it does, because it is based on the same factual predicate. If you take out the notion that these are trade secrets, if you agree with Judge Abrams that not enough was done to protect them, and therefore they're not trade secrets. They could still be confidential. They could be if he had a written agreement of some kind that restricted the bank's ability to own and use the spreadsheets, but he never had that. He simply delivered these spreadsheets as part of his advice. In essence, the bank got what it paid for and no more. Had he said to the bank in a contract of some kind, oral or written, these spreadsheets are worth more. These are not part of my engagement. You owe me more for them. At the outset, before the relationship and the bank never paid his fee, then perhaps he would have a claim for unjust enrichment that transcends the trade secret issue, but that this claim, just like his unfair competition claim, is based on exactly the same factual predicate. Is there a breakdown in the nature of the argument between you and counsel for Deloitte? No. You're both going to argue all the issues. I don't think there's any breakdown or disagreement between us and Deloitte. Deloitte may have its own argument. Well, I was going to say that, except Deloitte thinks that even if you lose, they should win. Well, Deloitte, I suspect, and Mr. Hartman can say this better than I, has a different argument about misappropriation, and it is even more removed from any allegation of misappropriation. We submit that the bank could not be deemed to have misappropriated because it never used the spreadsheets for any purpose other than what was contemplated. They could also have a different argument with respect to fraud because it's a question of who was doing the representation. Should we hear from Deloitte regarding their arguments? Are there further questions now from Mr. Banks? I don't have any more questions. I will yield then to Mr. Hartman. Thank you, Your Honors. Thank you. Thank you, Your Honors. May it please the Court, I'd like to spend just a brief moment or two focusing on what the complaint alleges and does not allege with respect to Deloitte. The complaint alleges that the bank hired Deloitte to take over the plaintiff's investment monitoring function, right, to monitor existing investments already made. And the complaint alleges that in connection with that, as one might... You're saying monitoring as opposed to deciding whether to enter into it in the first place. Correct. Monitoring investments. And so the bank, as one might expect with respect to that monitoring engagement, gave Deloitte spreadsheets to perform that function because it related to existing investments for which there were already spreadsheets. Now, the spreadsheets, from Deloitte's point of view, say nothing that suggests that they're a trade secret or even confidential. They're not password protected. They're not encrypted. They're not stamped confidential. They're just a spreadsheet. And nothing about the complaint alleges that between the interactions between Deloitte and the bank, there's anything that tells Deloitte or puts Deloitte on notice that these are confidential or proprietary or belong to the plaintiff as opposed to the bank. And so the complaint alleges that Deloitte uses the spreadsheets to perform its work for the bank, not for anybody else. Now, wasn't there an allegation? I'm sorry I don't have it at my fingertips, but that somebody from Deloitte posted on a LinkedIn page that they developed a model that sounded suspiciously like this model? And can we infer that perhaps there was use for other purposes? The complaint alleges that in connection with the engagement, Deloitte seconded a tax professional to the bank to perform the work. Again, that is what you'd expect under the circumstances. The complaint alleges that this tax professional separately on a LinkedIn page says that he's developed a model to evaluate wind farm investments, and from that we get the leap to he engaged in espionage to steal my model. But the problem with that is manifold. There's no allegation that this gentleman, who is plainly a tax professional, could not and did not develop his own model. In fact, the complaint alleges that Deloitte found problems with the plaintiff's model. There's no allegation that the plaintiff ever saw whatever this separate model was, and so there's really no way you can even infer. It's a leap to infer that it is somehow his model. There's no allegation that this particular professional was on notice in any way that this was a confidential spreadsheet that was proprietary to the plaintiff. And there's no allegation that he even requested the spreadsheets, let alone engaged in espionage to get them. These allegations have to cross the line from possibility to plausibility, and there's a complete absence of plausibility associated with that. Another point, there was no relationship between Deloitte and this plaintiff, no contractual relationship, no relationship really at all. They barely had any contact. The complaint says that they had less than a handful of telephone conversations, and the complaint doesn't allege in those conversations that the plaintiff said, these are mine, this is confidential and they belong to me, you can't use them or the bank can't give them to you without my permission. Is it Deloitte's position that given the allegations in this complaint, Deloitte would be free to use this model in providing services to other clients who seek advice about investments in renewables? From Deloitte's perspective, yes, because it's got no indication that this is a trade secret that belongs to the plaintiff or that it's the property of the plaintiff regardless of how you characterize it as opposed to the property of the bank. And does the unjust enrichment claim rise or fall on whether it's a trade secret? No, it doesn't from our perspective, and this applies to the unfair competition claim from our point of view too. They're plainly factually duplicative in the sense that they rely on the same underlying factual allegations. You obviously have one that characterizes the property as a trade secret or not. From our point of view, it's we did nothing wrong. They don't allege that we truly did anything wrong. And on top of that, you've got no bad faith allegations or anything that amounts to bad faith with respect to Deloitte, and you've got no special relationship with respect to Deloitte between this plaintiff and Deloitte that could support a claim for unjust enrichment. And by the way, I don't see how they allege that Deloitte was truly unjustly enriched. It did its work for the bank. It got paid. There's no credible allegation that they've taken these spreadsheets that apparently the model is baked into and are using them elsewhere for profit or gain. So it doesn't turn on trade secret for Deloitte. Wouldn't it save Deloitte a fair amount of resources to have a model up and running that they can use for their monitoring work rather than having to develop one from scratch themselves? Presumably Deloitte got paid for what it did. If it had to develop a new model or spreadsheets from scratch, presumably it would have had to do that and would have done it and gotten paid for that. There's no indication that it was paid in excess. Well, I guess one of the problems here, I don't know how you plead that, but without discovery, it would be awfully hard for the plaintiff to know what you did, what Deloitte did with it and how it used it and whether it was used for other people and so on and so forth. But respectfully, Your Honor, you've got to state a plausible claim first. We are the replacement consultant here, and he gets replaced. And he's not the first person ever to be replaced, and he sure won't be the last. It's a business setback, that's for sure, but this happens all the time. And the problem is that if this complaint suffices to state a claim and go into discovery, almost every instance where you have the replacement of a consultant in any context, not just this kind, you're going to have full-blown litigation. There has to be more than this. Unless the Court has additional questions, I'll stop there. Thank you. Thank you. Mr. Schiller, you were about? I just want to address the last point first. There was no okay, you're fired, someone else is coming in to take over your work. There was a two-year period in which lies and assurances were made to Mr. Powell's, as the allegations in the complaint reflect, and where they secretly continued to develop a plan to obtain the benefit of his work while replacing him. Were the lies made by somebody from Deloitte? Yes. On paragraph, we allege that in 2017 on March 10th, there was a conversation in which someone from Bank of New York said that Deloitte did not have the spreadsheets, which was a false statement. Now, we also think it was a false statement for the individual at Deloitte to say that he created a model that they didn't create. We know they didn't create it based on the way the relationship was terminated and their requests for him to answer questions about his model and a document that was shared from Deloitte describing his model in detail. Now, in addition to that, there were several other things that were said about the unjust enrichment claim that I'd like to address. First of all. One thing I want to just pick up on before you go to that. You talk about this conversation where somebody from the Bank of New York. That's right. Says, oh, no, they don't have it. And I'm trying to link. That's a fraud allegation, and I'm trying to link that to the injury because that representation didn't cause the disclosure of the spreadsheets in the first instance, right? Your theory of damages is somehow it prolonged the engagement with this client beyond what it would have been or it deferred your. It induced further work. Okay. So what did the damages look like for inducing further work? That doesn't have anything to do with providing the spreadsheets to them. They don't get the value of the spreadsheets as damage for that. So what's the damages for getting paid to continue to work for an additional increment of time? Well, first of all, that's a factual issue to develop both with lay witness testimony and expert testimony. But I believe the value of the intellectual property can be established quite fairly. And alternatively, the continued use of his labor to allow them to access and benefit from using the model he created, paying him was a fair consultancy fee going forward. So the fact that that terminated and that they continue to use the model to this day shows that they're getting the benefit of that and they're enriched in an unjust manner. No, I hear you on the unjust enrichment claim. I'm back on the fraud claim. I'm trying to understand what it would look like to say. And I understand you'd have to get into discovery for that. Your Honor is touching a central point that we think the court erred. The court determined that the confidentiality agreement started during a conversation five years into the relationship. Our allegations support the only inference that should be drawn, which is plausibly alleged that there was an oral agreement and understanding at the beginning of the relationship. This was a trusted friend who he'd worked with, who recruited him to come to Bank of New York, introduced him to the head of the tax department. He's dealing with two very senior people, and they've assured him at the beginning of the relationship that it's a confidential relationship and that they will treat the information he gives them. And are you asserting that those representations are the statements that underlie your fraud claim? I thought your fraud claim turned on this March 2017 statement that said you don't have them. I think that's further evidence that he was misled from the beginning. So at the very outset when they said, come work for us, what's the fraudulent claim? If we have an opportunity to take discovery, Your Honor, my client no longer has access to the e-mails he used. And if we had an opportunity to go back and look, I'm sure I could demonstrate that quite clearly for you. We've demonstrated it in the best way we can, and that conversation was one that reaffirmed his understanding, that he recalled quite clearly. I'm just trying to figure out, given the pleading standard for a fraud claim, what the fraudulent representations are that underlie that claim. And it sounds like maybe there's something at the outset of the relationship that I misunderstood. I didn't understand what was part of your fraud claim, and I just wanted to focus on that. Sure, I appreciate that. So he was hired not to provide them with the analytical tool, but to provide his services. Okay. Therefore, when they asked him and agreed, they would keep it very limited if he would share the tool with him, this mathematical process that he had created. He did it on a limited basis based on that understanding that he had. So each time they asked for the model, I would argue it is an instance of fraud. Okay. You said he was hired for his services. That's right. And that the information he would give them would be confidential. But surely the information he would give them would be the valuation of the wind farm properties. Right. Well, it's not just that. It's an ongoing process, right? He would keep them confidential, and they would keep confidential what he was doing. Does that mean that these spreadsheets, the methodology, would be confidential? Well, yes, and to the degree that he was concerned about that when he provided them with a spreadsheet, he would limit the information so that someone couldn't reverse engineer it, which is exactly what happened when Deloitte got their hands on it. They couldn't figure out what he had done because he hadn't given them the complete information in that version of the spreadsheet that he had printed out. You know, he made various different investments. But surely he gave them something from which somebody reverse engineered the method that you claim. He gave them unlimited instances to model, yes. Yeah. Now, he was hired to come up with a valuation for these properties, and Deloitte was later hired to monitor the value of those properties. Right. How could Deloitte do that without having the method by which they were valued in the first place? By using their own proprietary method. Now, if you wanted to monitor the investment, presumably you would start from the point in which they were initially acquired, right, and see how they were doing. Well, I think that's what they did. Because what you're saying is that they would have had to come up with their own system for valuing it and therefore for monitoring it. They couldn't monitor it without valuing it. Monitoring is just the continuous valuing of it. That's right. And then they would have had to charge the Bank of New York for that time and that work and that effort. And by being able to – But the property had already been valued according to a certain method. Didn't Deloitte have to have information about what that method was in order to be able to monitor how the property was doing? My understanding is they could have created their own model. In fact, this gentleman from Deloitte claimed to have invented his own model. But that was a lie. Thank you. Thank you very much, Mr. Shiller. Thank you, Your Honor. Thank you. Thank you. Mr. Magasuba, you can come forward if you're here. Thank you. Mr. Magasuba, you can leave your mask on if you'd like, or you can remove it when you're arguing, as you choose. Okay.